**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Armored Group, LLC, a Nevada Limited Liability Company,<br><br>    Plaintiff,<br><br>vs.<br><br>Supreme Corporation, a Texas Corporation; and Supreme Corporation of Texas, a Texas Corporation,<br><br>    Defendants. | No. CV 09-414-PHX-NVW<br><br>**ORDER** |

Defendants Supreme Corporation and Supreme Corporation of Texas (collectively "Supreme") move for judgment on the pleadings against Plaintiff The Armored Group, LLC ("Armored Group") on Counts One, Two, and Three of Armored Group's Third Amended Complaint under Fed. R. Civ. P. 12(c). (Doc. # 103.) For the reasons stated below, the Court denies Supreme's motion.

**I. Background**

Armored Group markets and sells armored trucks, armored SUVs, armored vans, cash in transit vehicles, mobile check cashing and mobile ATM vehicles. Armored Group alleges that from 2004 to 2006 it contracted with Robert Wilson, President of Supreme Corporation, to be the exclusive sales representative for all armored vehicle products sold by it or its sister company, Supreme Corporation of Texas. The written contract ("2004 Written Agreement") also provided that Armored Group, "shall be entitled to a

Commission on all purchase orders received and accepted by Supreme prior to the termination of the Agreement, regardless of the place of delivery of the products and regardless of whether or not [Armored Group] is directly or indirectly responsible for the sale." Armored Group alleges that upon expiration of the 2004 Written Agreement on December 31, 2006, it entered into an oral agreement with both companies to continue performing their sales and marketing on a nonexclusive basis. Supreme orally agreed to pay Armored group a 10% commission on (1) the gross sales price of all armored vehicle sales brought to Supreme, and (2) the gross sales price of all armored vehicle products sold to customers under any vendor contract that resulted from Armored Group's past and future work efforts. Robert Wilson and James Bandy, Vice President of Supreme Corporation of Texas, agreed to these terms in telephone conversations with Armored Group's CEO, Robert Pazderka, on or about December 31, 2006.

Thereafter, Armored Group alleges that it continued to maintain office space and business cards at Supreme Corporation of Texas's facility and that Supreme in fact paid the agreed upon 10% commissions on new sales. Armored Group also continued working to secure a lucrative vendor contract with the U.S. State Department for Supreme, which it had begun pursuing while the original written agreement was in effect. On or about June 2007, Supreme learned that it was going to be awarded the vendor contract. Before the contract was officially awarded, Robert Wilson allegedly terminated the oral agreement with Armored Group to avoid paying it commissions for securing the vendor contract. Supreme Corporation of Texas has since sold at least $500,000 worth of armored vehicle products under the vendor contract. Armored Group alleges that Supreme never intended to pay the agreed upon commission for the vendor contract, but orally agreed to do so to induce Armored Group to continue working to close the deal. Based upon these allegations, the Third Amended Complaint asserts in Counts One, Two, and Three that Supreme breached the oral agreement, committed fraud, and has been unjustly enriched.

**III. Motion For Judgment on the Pleadings**

**A. Legal Standard**

Judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 939 (9th Cir. 2009).

**B. Consideration of Material Referenced by the Parties**

As a general rule, a district court may not consider materials not originally included in the pleadings in deciding a Rule 12 motion. *See U.S. v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008). However, a document not attached to the complaint may be considered if it is referred to in the complaint and the authenticity of the document is not questioned. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994). The Court will consider the email Armored Group attached to its response and the 2004 Written Agreement included in Supreme's Motion for Judgment on the Pleadings because Armored Group refers to the email and to the 2004 Written Agreement in the Third Amended Complaint, and there is no dispute over the authenticity of these documents. However, the Court will disregard Armored Group's eight references to deposition testimony because the testimony is extraneous to the complaint and can only be considered if the Court treats Supreme's motion as a motion for summary judgment, which the Court will not do.

**C. A.R.S. § 44-1798.01**

Supreme argues that Armored Group cannot maintain Counts One and Three of the Third Amended Complaint because A.R.S. § 44-1798.01, which is part of Arizona's sales representative contracts statute, operates as a statute of frauds and renders the oral agreement between Armored Group and Supreme unenforceable. Arizona's sales representative contracts statute applies to "principals" and "sales representatives." A.R.S. § 44-1798. A principal is a person who is in the business of manufacturing or selling products or services, uses a sales representative to solicit orders for the product or service, and compensates the sales representative, at least in part, by commission. *Id.* A sales

representative is a person who establishes a business relationship with a principal to solicit orders for products or services and is compensated, at least in part, by commission. *Id.*

The statute contains a number of protections for sales representatives. When the agreement between a principal and a sales representative is terminated, the principal must pay all of the commissions due to the sales representative at the time of termination within thirty days after termination, and all of the commissions that become due after the effective date of the termination within fourteen days after they become due. A.R.S. § 44-1798.02. A principal who fails to comply with these requirements is liable for three times the amount of the commission owed. *Id.* The prevailing party in an action brought under the statute is entitled to costs and attorneys' fees. *Id.*

The statute provides additional protections in that it enables a sales representative to recover his commission if (1) the principal makes a revocable offer and revokes the offer in order to avoid paying the commission, (2) the revocation occurs after the principal has obtained an order for his products through the efforts of the sales representative, and (3) the product is provided to and paid for by the customer. A.R.S. § 44-1798.03. A principal who establishes a business relationship with a sales representative to solicit orders in Arizona is considered to be doing business in Arizona for purposes of jurisdiction. *Id.* § 44-1798.04. Any provision in a contract purporting to waive a provision of the statute is considered void. *Id.*

When first enacted in 1990, the statute provided that, "at the request of either party," the sales representative and the principal "shall enter into a written contract." A.R.S. § 44-1798.01(A) (1990). It also stated that the principal "shall provide each sales representative with a signed copy of the contract" and "shall obtain a signed receipt for the contract from each sales representative." *Id.* § 44-1798.01(B). Thus, the original statute did not require a written contract. However, in 2006 the statute was amended and now provides: "The sales representative and the principal shall enter into a written contract. The contract shall set forth the method by which the sales representative's

- 4 -

commission is to be computed and paid." A.R.S. § 44-1798.01(A) (2006). The requirement that the principal provide each sales representative with a signed copy of the contract was kept in its original form. *Id.* § 44-1798.01(B). Supreme contends that the amendment created a statute of frauds.

"When analyzing statutes, [Arizona courts] apply fundamental principles of statutory construction, the cornerstone of which is the rule that the best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *Backus v. State*, 220 Ariz. 101, 104, 203 P.3d 499, 502 (2009). However, when a statute is ambiguous, courts may look to principles of statutory construction to interpret the statute. *See State v. Sweet*, 143 Ariz. 266, 269, 693 P.2d 921, 924 (1985). "An ambiguity in a statute is not simply that arising from the meaning of particular words, but includes such as may arise in respect to the general scope and meaning of a statute when all its provisions are examined." *Id.* (internal quotation and citation omitted). An ambiguity may also be present where there is uncertainty as to the meaning of the terms of a statute. *Id.* In some cases, the ambiguity may arise not because certain words or groups of words have more than one meaning, but because the statute does not include necessary words, which causes confusion as to the scope of the statute. *Id.* at 270, 693 P.2d at 925.

The language of A.R.S. § 44-1798.01 is not clear and unequivocal. While it is clear that a writing is required, the statute does not specify the consequence of not having a written contract. A statute can sometimes be reasonably construed in more than one way due to an omission. *Sweet,* 143 Ariz. at 270, 693 P.2d at 925. There are a number of possible readings of the writing requirement of A.R.S. § 44-1798.01. One is that either party can sue to require the other to reduce an agreement to writing. Another is that, without a writing, a sales representative cannot invoke the protections and benefits, such as damages in the amount of three times the commission due, of the statute. A third is Supreme's construction that A.R.S. § 44-1798.01 operates as a statute of frauds. Finally, because A.R.S. § 44-1798.01(B) provides that the principal shall furnish a copy of the

- 5 -

agreement to the sales representative, the failure to have a writing may suggest that the principal failed to fulfill a duty created by the statute.

"When there is confusion in statutory interpretation, it is necessary . . . to determine the legislative intent for the statute." *Sweet,* 143 Ariz. at 270, 693 P.2d at 925. When determining the intent of the legislature, it is helpful and proper to turn to the overall purposes and aims of the legislature in enacting the statute in order to glean the legislative intent. *Id.* As Armored Group contends, it is apparent from reading the statute that the legislature enacted A.R.S. § 44-1798 in order to protect sales representatives. The statute requires principals to pay commissions due to sales representatives promptly upon termination of their business relationship. It allows a sales representative who successfully sues under the statute to collect three times the commission due. It also sharply limits the ability of a principal to object to personal jurisdiction. These provisions illustrate that the purpose of the statute is to protect sales representatives.

This understanding is confirmed by the legislative history surrounding the passage of S.B. 1501, 39th Leg., 2d Reg. Sess. (Ariz. 1990), the first bill that was later codified as A.R.S. §§ 44-1798–44-1798.05. Courts may look to legislative history to ascertain the intent of the legislature. *See Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 214 Ariz. 293, 299, 152 P.3d 490, 496 (2007) (examining committee minutes and senate fact sheet in order to determine legislative intent). The legislature appears to have adopted the statements concerning the bill's purpose of Tom Taradash, past president of the Arizona Apparel Association. According to the minutes of the Senate Committee on Commerce, Labor, Insurance, and Banking, Tom Taradash testified that the purpose of the bill "was to provide a method for which a commissioned sales representative may receive prompt payments of commissions due him/her upon termination." Minutes of the Committee on Commerce, Labor, Insurance, and Banking for S.B. 1501, 39th Leg., 2d Reg. Sess. (Ariz. 1990). The bill would allow the sales representative to pursue compensation due in Arizona rather than the state in which the company that hired the sales representative was located. *Id.* The concern was that many companies put off paying commissions knowing

that it would be too expensive and time consuming for the sales representative to sue in another state. *Id.* The committee ultimately recommended the passage of the bill. *Id.*

It also appears that the writing requirement of A.R.S. § 44-1798.01 was intended to protect sales representatives. A.R.S. § 44-1798.01(B) places the onus of providing a writing on the principal: "The principal shall provide each sales representative with a copy of the contract." If the burden is on the principal, penalizing the sales representative by rendering the agreement unenforceable when the parties do not reduce their agreement to writing would appear to run contrary to the legislature's intent.

The legislative history generated during the passage of the original bill also suggests that the writing requirement protects sales representatives. The bill summary from the Arizona House of Representatives explains that the bill allows either party to the sales representative agreement to request that the contract be in writing. House Summary for S.B. 1501, 39th Leg., 2d Reg. Sess. (Ariz. 1990). And, "[i]f there is a written contract, the principal is required to provide the sales representative with a signed copy of the contract . . . ." *Id.* The minutes from the meeting of the House's Commerce Committee also contain a short discussion in which Representative Goudinoff asked "if a written contract is mandated or an option in the bill" or "if they could foresee any problems where the [principals] would stop using written contracts" in response to the bill. Minutes of the Commerce Committe for S.B. 1501, 39th Leg, 2d Reg. Sess. (Ariz. 1990). Mr. Taradash, testifying in support of the bill, responded that a written contract would be an option and that he did not "foresee any problems." Ms. McCarl, from the Electronic Industries Association, the organization that sponsored the bill, stated that her organization was not "opposed to written contracts" but was opposed to legislation that would mandate contractual terms. *Id*. This exchange suggests that the concern of the committee members who passed the original bill was that principals would resist reducing agreements to writing.

There is very little legislative history that touches upon the passage of S.B. 1402, 47th Leg. Sec. Reg. Sess. (Ariz. 2006), the bill that amended the statute in 2006. The

House Summary only states that the bill "requires the principal and the sales representative to enter into a written contract, rather than at the request of either party." House Summary for S.B. 1402, 47th Leg. Sec. Reg. Sess. (Ariz. 2006). The Senate Fact Sheet simply states that the amendment "requires the sales representative and the principal to enter into a written contract." Senate Fact Sheet for S.B. 1402, 47th Leg. Sec. Reg. Sess. (Ariz. 2006). However, in light of the fact that the overall goal of the legislation is to protect sales representatives, and that the option of a writing, at least when the first bill was passed, was probably included to protect sales representatives, it seems highly unlikely that the legislature intended, by adding the writing requirement in 2006, to fashion a statute of frauds, which, in effect, would prevent sales representatives from recovering unless there is a writing. In fact, it is clear that the legislature, at least initially, did not intend to create a statute of frauds, since having a writing was optional in the original statute. At a minimum, such a significant change would likely have generated some discussion. However, there is nothing to suggest that the legislature contemplated that A.R.S. § 44-1798.01 would operate as a statute of frauds.

      If the legislature intended A.R.S. § 44-1798.01 to be a statute of frauds, it could have explicitly said so. *See Lee v. State*, 218 Ariz. 235, 236-38, 182 P.3d 1169, 1170-72 (2008) (declining to abrogate long-held understanding of mail delivery rule in light that statute requiring that claimant "file" a notice of claim did not speak to the proof required to show delivery and the legislature could have, but did not, specify what sort of delivery constituted a filing). A.R.S. § 44-101, which is Arizona's general statute of frauds, is titled "Statute of Frauds" and explicitly states that, "no action shall be brought in any court in the following [nine] cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged . . . ." In contrast, there is no language whatsoever in A.R.S. § 44-1798.01 that even suggests that the consequence of not having a written contract is that "no action" may be brought in court.

In addition, a written contract is not necessarily required to satisfy a statute of frauds. As A.R.S § 44-101 explains, even "some memorandum" of the agreement between the parties may suffice to take the agreement out of the statute. *See Custis v. Valley Nat'l Bank*, 92 Ariz. 202, 205, 375 P.2d 558, 561 (1962) ("A memorandum sufficient to satisfy the requirements of the Statute of Frauds need not be a writing intended by the parties to be the integration of their agreement. It may be an informal writing, such as a letter, and may be addressed to a third party . . . .") (internal quotations and citations omitted). The agreement or memorandum must also be signed by the party to be charged. A.R.S. § 44-101; RESTATEMENT (SECOND) OF CONTRACTS § 131 (1981). Had the legislature intended A.R.S. § 44-1798.01 to be a statute of frauds, it is reasonable to expect that it would have specified that "some memorandum" of the agreement sufficed, and that the writing had to be signed by the party to be charged. However, there is no language to that effect in A.R.S. § 44-1798.01.

The sales representative contracts statute gives sales representatives a number of generous benefits and protections. If Supreme's construction were adopted, sales representatives laboring under oral agreements would be deprived of not only the additional benefits created by the statute, but also of a run-of-the-mill action in contract, even though the provision at issue contains none of the terminology that is typically associated with statutes of frauds, does not specify any consequences for failing to have a writing, was not initially intended as a statute of frauds, and even though the purpose of the statute is to protect sales representatives. This cannot be what the legislature intended in amending A.R.S. § 44-1798.01 to require a writing.

For these reasons, the Court finds that A.R.S. § 44-1798.01 does not operate as a statute of frauds. Therefore, Supreme's contention that Counts One and Three must be dismissed for failure to comply with the writing requirement of A.R.S. § 44-1798.01 fails.

**D. Unjust Enrichment**

Supreme contends that Armored Group may not pursue its unjust enrichment claim because unjust enrichment is not a remedy that is legally available to a contracting party.

It argues that under the 2004 Written Agreement, Armored Group was not entitled to commissions on any orders received by Supreme after December 31, 2006. According to Supreme, it therefore follows that Armored Group is entitled to commissions after December 31, 2006, only if required by a subsequent contract between the parties, such as the alleged oral agreement. But if the parties entered into a contract, as Armored Group alleges, then the terms of that contract, and not an unjust enrichment theory, control Armored Group's right to recovery.

Supreme's contention misses the mark. The 2004 Written Agreement states, "After the termination of this Agreement for any reason whatsoever, [Armored Group] shall be entitled to a Commission on all purchase orders received and accepted by Supreme prior to the termination of the Agreement, regardless of the place of delivery of the Products and regardless of whether or not [Armored Group] is directly or indirectly responsible for the sale." That provision, Supreme contends, disallows Armored Group's claimed commissions on purchase orders not "received and accepted by Supreme prior to the termination of the Agreement." However, that provision does not state that Armored Group will not receive commissions on sales procured by Armored Group after the termination of the 2004 Written Agreement. Without deciding the issue, the contract appears to be silent as to what would happen in those circumstances, perhaps because the parties assumed that if Supreme terminated the contract, Armored Group would no longer continue to procure sales on Supreme's behalf. Armored Group's Third Amended Complaint, while not crystal clear, fairly alleges that Supreme's contract with the State Department was the result, at least in part, of efforts undertaken by Armored Group after the expiration of the 2004 Written Agreement. The Third Amended Complaint therefore can be fairly read to state that either the oral agreement governs; or, if the oral agreement is unenforceable, as Supreme contends, then Armored Group is entitled to restitution under an unjust enrichment theory.

*Trustmark Insurance Co. v. Bank One, Arizona, NA*, 202 Ariz. 535, 541, 48 P.3d 485, 491 (Ct. App. 2002), is inapposite because Armored Group is not trying to "avoid

possible contractual limitations on its recovery by resorting to an unjust enrichment cause of action." Instead, Armored Group seeks to recover either under the oral agreement or pursuant to an unjust enrichment theory. A person is unjustly enriched if he has received a benefit and retention of the benefit would be unjust. RESTATEMENT OF RESTITUTION § 1 cmt. a (1937). If a person performs work, renders services, or expends money under an agreement which is unenforceable, but not illegal, he may recover in quantum meruit for the value of the services and expenses reasonably incurred in good faith. *Ruck Corp. v. Woudenberg*, 125 Ariz. 519, 522, 611 P.2d 106, 109 (Ct. App. 1980). In fact, where an express contract is pleaded, it has been held unnecessary to plead a claim in quantum meruit or in quasi-contract, even though the latter is the only available basis of recovery.[1] *Trollope v. Koerner*, 106 Ariz. 10, 19, 470 P.2d 91, 100 (1970). Rule 8(d) of the Federal Rules of Civil Procedure provides that a party may state as many separate claims or defenses as it has, regardless of consistency. Fed. R. Civ. P. 8(d). Armored Group may therefore plead breach of contract and unjust enrichment as alternate theories.

IT IS THEREFORE ORDERED that Supreme's Motion for Judgment on the Pleadings (doc. # 103) is denied.

DATED this 23rd day of June, 2010.

_____
Neil V. Wake
United States District Judge

---

[1] Restitution began as a remedy to enforce contractual rights which could not be enforced in common law courts due to lack of formality of the contract. *Murdock-Bryant Constr. v. Pearson*, 146 Ariz. 48, 52, 703 P.2d 1197, 1201 (1985). *Quantum meruit* was a common law action which allowed recovery where the plaintiff had performed services for the defendant, whether the services were provided at the defendant's request, or under a theory of implied-in-fact contract, or without the defendant's request but benefitting him in some way. *Id.* at 52-23, 703 P.2d at 1201-02. This concept had as its central core the principle against unjust enrichment, and it has been adopted by the American Law Institute, which has stated: "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Id.* at 53, 703 P.2d at 1202 (quoting RESTATEMENT OF RESTITUTION § 1). These concepts are also a part of Arizona jurisprudence. *Id.*

- 11 -