**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Armored Group, LLC, a Nevada Limited Liability Company,<br><br>      Plaintiff,<br><br>vs.<br><br>Supreme Corporation, a Texas corporation; and Supreme Corporation of Texas, a Texas corporation,<br><br>      Defendants. | No. CV-09-00414-PHX-NVW<br><br>**Order** |

Before the Court is Defendants' Motion for Summary Judgment (Doc. 153) and Plaintiff's "Motion to Strike (1) Defendants' Controverting Statement of Facts to Plaintiff's Additional Statement of Facts and (2) Portions of Defendants' Reply Brief in Support of their Motion for Summary Judgment" (Doc. 183). The Court will deny Defendants' motion and deny Plaintiff's motion as moot.

Throughout this order, the Court refers to Plaintiff as "Armored Group" and to Defendants collectively as "Supreme." The Court recognizes that some of Defendants' arguments hinge on separate treatment for Supreme Corporation and Supreme Corporation of Texas. The Court's use of "Supreme" herein is for convenience only and is not intended to state a factual or legal conclusion about the relationship between the two Supreme entities.

### I.     Plaintiff's Motion to Strike

Before resolving Supreme's summary judgment motion, this Court must first resolve Armored Group's motion to strike the additional statement of facts submitted with Supreme's reply and the portions of Supreme's reply relying on the additional statement of facts. Armored Group is correct that the Local Rules do not permit the additional statement of facts. The Court has nonetheless examined Supreme's additional statement, and found it unhelpful in resolving its summary judgment motion, save for a statement that Supreme does not dispute (for purposes of summary judgment) certain facts asserted by Armored Group. (*See* Doc. 180 at 1:24–27.) Because this statement was helpful to Armored Group — the nonmoving party — and because the Court did not rely on any other portion of Supreme's additional facts or any portion of Supreme's reply brief relying on those additional facts, the Court will deny Armored Group's motion to strike as moot.

### II.    Summary Judgment Standard

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of production by producing "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105–06 (9th Cir. 2000).

When the moving party has carried its burden, the nonmoving party must respond with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The nonmoving party "may not rely merely on allegations or denials in its own pleading." *Id.*

Allegedly disputed facts must be material—the existence of only "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the nonmoving party's properly presented evidence is presumed to be true and all inferences from the evidence are drawn in the light most favorable to that party. *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987).

**III.   Facts**

The following facts are not disputed unless specifically attributed to one party or the other.

**A.   Armored Group's Relationship with Supreme**

Armored Group and Supreme are both in the business of specialized vehicles such as armored cars. From 1996 through the end of 2006, Armored Group exclusively distributed Supreme's products. During those years, Supreme and Armored Group operated under a series of written contracts through which Supreme agreed to pay Armored Group a 10% commission on "all armored vehicle products" sold by Armored Group on behalf of Supreme. As part of that relationship, Armored Group established an office and sales force at a Supreme factory in Texas.

Technically, Armored Group's contracts were with "Supreme Corporation, an Indiana Corporation." Defendant Supreme Corporation as well as Defendant Supreme Corporation of Texas are, in reality, both incorporated in Texas, although Supreme Corporation has its principal place of business in Indiana. However, according to Armored Group's CEO (and 30(b)(6) representative) Robert Pazderka, the Supreme entity with which Armored Group had contracted was immaterial to their actual relations because Armored Group received commissions regardless of the entity for which Armored Group brokered a sale.

The parties' final written distributorship agreement ran from 2004 through December 31, 2006 ("2004–2006 Contract"). Anticipating the end of that agreement, the parties began negotiating a new agreement in 2005. Supreme proposed an agreement to Armored Group that Armored Group found unacceptable because it would not receive commissions on sales to a potentially valuable new client — the U.S. State Department. Armored Group had been working since 2003 to secure a State Department contract for Supreme and did not want to be left uncompensated for its efforts.

On December 7, 2005, Supreme sent a letter to Armored Group expressing Supreme's intent to let the 2004–2006 Contract expire. The parties nonetheless continued to discuss the potential for a new contract well into 2006. Pazderka claims that in August 2006 he had a telephone conversation with Supreme's president, Robert Wilson. In that conversation, Pazderka and Wilson allegedly entered into an oral contract intended to take effect when the 2004–2006 Contract expired. The relevant terms of that contract, according to Pazderka, were as follows: Armored Group would continue to distribute Supreme products (*i.e.*, from all Supreme entities) on a non-exclusive basis; Supreme would not solicit sales from Armored Group's customers; and, most importantly for this lawsuit, Supreme would continue to pay a 10% commission to Armored Group for sales to customers that Armored Group brought to Supreme through its "past, current, or future efforts." Pazderka claims that he and Wilson intended this oral agreement to bridge the gap between the end of the 2004–2006 Contract and an anticipated new written contract, but Pazderka also testified that the oral agreement would otherwise run indefinitely.

Shortly after Pazderka and Wilson conversed by telephone, Pazderka sent an e-mail to Wilson, dated August 4, 2006, summarizing Pazderka's understanding of the alleged oral agreement and asking Wilson to reply if he had a different understanding. Pazderka received no reply. He sent a substantially identical e-mail to Wilson four days later, and again received no reply. At some point before the end of 2006, an executive at Supreme Corporation of Texas informed Pazderka that Armored Group and Supreme would continue to do "business as usual" following the expiration of the written agreement.

- 4 -

1    As expected, the 2004–2006 Contract terminated on December 31, 2006. Armored
2 Group maintained its office and sales force at Supreme's Texas factory, and generally
3 conducted "business as usual" for a time. Armored Group claims that this "business as usual"
4 included additional efforts to secure a State Department contract for Supreme. However, by
5 letter dated July 24, 2007, Supreme informed Armored Group that it considered their
6 relationship terminated save for a continuing simple vendor-customer relationship.
7 Supreme's letter referred only to the parties' relationship under the 2004–2006 Contract, and
8 did not mention any continuing oral agreement. Finally, in August 2007, the State
9 Department awarded a contract to Supreme. The contract is worth up to $100 million and has
10 so far resulted in sales of approximately $27 million.

### B. Armored Group's Relationship with the Livonia Police Department

Although Armored Group's formal relationship with Supreme ended in July 2007, Armored Group continued to work with Supreme on at least one sale involving a "rapid deployment vehicle," or "RDV," to the Livonia (Michigan) Police Department. To buy from Armored Group without a bidding process, Livonia apparently needed a letter stating that Armored Group was the "sole source provider" of the RDV. Although Supreme would actually build the RDV, Armored Group nonetheless issued a letter to Livonia stating that Armored Group was the "sole source provider." In its summary judgment papers, Armored Group contends that the letter to Livonia was accurate because (a) Supreme had allegedly agreed not to compete with Armored Group's customers, (b) Livonia was one such customer, and therefore (c) from Livonia's perspective, Armored Group was the "sole source provider" of the RDV in question.

Armored Group's contract with Livonia came together in October 2007. Armored Group then issued a purchase order to Supreme in November 2007 and paid supreme a 50% deposit in January 2008. In February 2008, however, Supreme allegedly took action to circumvent Armored Group and sell the RDV directly to Livonia. The parties' respective accounts of these events conflict in several respects. According to Supreme, a Supreme representative named David Chapman was manning a promotional booth at a Chiefs of

- 5 -

1  Police convention in Grand Rapids, Michigan, on February 7, 2008. A representative from
2  the Livonia Police Department approached the booth and noticed a picture of an RDV. The
3  Livonia representative mentioned that his police department had recently contracted to buy
4  such an RDV from Armored Group. In the course of that conversation, Chapman informed
5  the Livonia representative that Supreme, not Armored Group, would build the RDV that
6  Livonia had purchased. Livonia thereafter sent a letter to Armored Group stating that it
7  would terminate its contract for the RDV because Armored Group was not the "sole source
8  provider." Livonia then contracted with Supreme for the RDV.

9          Armored Group's version of events is less detailed as to the circumstances of
10  Supreme's communications with Livonia, but more detailed with respect to what Chapman
11  allegedly said. The termination letter from Livonia to Armored Group not only mentions the
12  "sole source provider" issue, but also states that Livonia learned from Supreme —
13  presumably through Chapman — that: (i) Supreme had stopped taking orders from Armored
14  Group as of August 1, 2007, (ii) Supreme had only received the RDV purchase order from
15  Armored Group in the past week, (iii) Supreme had done no work on the purchase order,
16  (iv) the purchase order went beyond the scope of Supreme's agreement to build vehicles for
17  Armored Group, and (v) Armored Group had, as yet, spent no money on the RDV. Because
18  most if not all of these statements were incorrect at the time they were made, Armored Group
19  presumes that Supreme intentionally acted to disrupt the Livonia contract.

20      **IV.**   **Legal Analysis**

21          Based on the foregoing facts, Armored Group's complaint alleges six causes of action:
22  (1) breach of oral contract and breach of good faith and fair dealing; (2) unjust enrichment;
23  (3) fraud in the inducement; (4) tortious interference with contract; (5) breach of written
24  contract and breach of good faith and fair dealing; and (6) promissory estoppel. Supreme now
25  moves for summary judgment, arguing that all of these causes of action fail for various
26  reasons. The Court will analyze each cause of action in turn.

27          **A.**   **Count One: Breach of Oral Contract and Breach of Good Faith and Fair Dealing**
28

### 1. Insufficient Terms

Supreme believes that Armored Group's alleged oral contract is unenforceable for lack of sufficiently specific terms. But, viewing the evidence in the light most favorable to Armored Group, a reasonable jury could conclude that the alleged oral contract simply extended the terms of the expiring written contract, save for the exclusivity provision. Further, it is undisputed that the parties had been doing business since 1996 under a series of materially indistinguishable written contracts. Thus, to the extent that Armored Group's alleged oral contract lacks material terms, course of dealing under the written contracts may fill in the gaps. *See AROK Const. Co. v. Indian Const. Servs.*, 174 Ariz. 291, 298, 848 P.2d 870, 877 (Ct. App. 1993) ("evidence of a course of dealing involving a standard form contract [may] supply any missing terms").

Supreme, however, asserts that the written agreements actually emphasize the uncertainty of the oral agreement, pointing out that the written contracts were specifically between Armored Group and Supreme Corporation, whereas the claimed oral agreement was between Armored Group and the entire Supreme family of companies. But according to Pazderka's affidavit opposing summary judgment, the parties' course of dealing while the written contracts were in force included payment of commissions to Armored Group regardless of the Supreme entity for which Armored Group brokered a sale. (Doc. 166-1 at 11 ¶ 4.) Therefore, regardless of which Supreme entity signed the written contracts, a jury could reasonably credit Pazderka's testimony that the parties intended to continue their course of dealing with respect to the various Supreme entities.

Supreme further points out that, in a previous pleading, Armored Group disavowed the terms of the 2004–2006 Contract. Specifically, in response to Supreme's motion to dismiss and alternative motion to transfer based on a forum selection clause (Doc. 10), Armored Group countered that "none of [its] claims arise under the 2004[–2006] Contract. Rather, they are based on the Oral Agreement, a completely separate contract without a forum selection clause" (Doc. 18 at 3). To permit Armored Group now to rely on the 2004–2006 Contract, says Supreme, is allowing Armored Group to "have it both ways."

- 7 -

1    Supreme appears to argue for judicial estoppel, but judicial estoppel is not appropriate
2    in this circumstance. "[J]udicial estoppel[] generally prevents a party from prevailing in one
3    phase of a case on an argument and then relying on a contradictory argument to prevail in
4    another phase." *Zedner v. United States*, 547 U.S. 489, 504 (2006) (internal quotation marks
5    removed). Among the factors courts consider in the judicial estoppel analysis is "whether the
6    party has succeeded in persuading a court to accept that party's earlier position." *Id.* Here,
7    the Court did not reach Armored Group's argument regarding the forum selection clause
8    because the Court granted Supreme's motion to dismiss. (Doc. 25.) Therefore, Armored
9    Group did not persuade the Court to accept its earlier position. Armored Group's statement
10   about the relationship between the 2004–2006 Contract and the alleged oral contract may be
11   admissible for its evidentiary value, *see Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224,
12   226–27 (9th Cir. 1988); 30B Michael H. Graham, *Federal Practice & Prodecure: Evidence*
13   § 7206 (interim ed. 2006), but it does not support a claim for judicial estoppel.

### 2.    **Inadequate Consideration**

15   Supreme contends that Armored Group's alleged oral contract would be invalid for
16   lack of consideration because it is a non-exclusive sales representative agreement, and
17   therefore Armored Group's duties were optional, illusory, and otherwise inadequate as a
18   matter of law. The Court finds that summary judgment is not appropriate on this issue.

19   For purposes of this analysis, the alleged oral agreement appears to have three parts,
20   two of which are not susceptible to Supreme's failure-of-consideration argument. The first
21   part addresses compensation for sales to customers that Armored Group had brought to
22   Supreme while the written agreement was in force. The second part addresses sales to
23   customers (such as the State Department) that Armored Group allegedly solicited while the
24   written agreement was in force but which did not begin placing orders until after that
25   agreement expired. The third part addresses new sales brokered by Armored Group in its
26   non-exclusive role after the written agreement expired.

27   With respect to the first two parts, Armored Group provided sufficient consideration
28   at the time it contracted to be Supreme's exclusive distributor by explicitly promising its best

efforts to Supreme. *See also A.R.A. Mfg. Co. v. Pierce*, 86 Ariz. 136, 138–39, 341 P.2d 928, 930 (1959) ("an implicit promise of every exclusive distributorship agreement [satisfying the need for consideration] is . . . that [the agent] will use his best efforts to promote the sale of the manufacturer's product"). With respect to the third part — new sales brokered under the non-exclusive oral agreement — Supreme is correct that non-exclusive agency contracts are sometimes considered null on the theory that a non-exclusive agent undertakes nothing but optional duties toward the principal and therefore gives no consideration. *See*, *e.g.*, *Nily Realty, Inc. v. Wood*, 325 A.2d 730, 735–37 (Md. 1974); *Higgins v. Egbert*, 182 P.2d 58, 61 (Wash. 1947); *Restatement (Third) of Agency* § 8.13 cmt. c. But even in this analysis, the agent's performance under the contract cures the defect. *See*, *e.g.*, *Real Estate Listing Serv., Inc. v. Real Estate Comm'n*, 425 A.2d 581, 585 (Conn. 1979). A non-exclusive agency contract, therefore, is an offer for a unilateral contract. *See id.*; *cf. Farm & Auto Supply v. Phoenix Fuel Co.*, 103 Ariz. 344, 346–48, 442 P.2d 88, 90–92 (1968) (interpreting a wholesaler-purchaser relationship as a standing offer for a series of unilateral contracts).

Arizona law "favors [contract] enforcement when it is clear that the parties intended themselves to be bound." *AROK*, 174 Ariz. at 297, 848 P.2d at 876. Assuming for purposes of this motion that the parties entered into the oral agreement, this Court interprets the part of that agreement addressing future sales as a standing unilateral contract offer. To the extent that Armored Group performed — as it claims it did — the contract does not fail for lack of consideration.

### 3.     Statute of Frauds

Supreme argues that Armored Group's alleged oral contract runs afoul of the statute of frauds because the contract was intended to run in perpetuity, and therefore could not be performed within one year. A.R.S. § 44-101(5) ("No action shall be brought in any court . . . [u]pon an agreement which is not to be performed within one year from the making thereof."). However, Arizona courts traditionally construe the one-year requirement narrowly. "[T]he words 'not to be performed within one year' [have been consistently interpreted to] mean 'impossible to be performed within one year.'" *Co-Op Dairy, Inc. v.*

1  *Dean*, 102 Ariz. 573, 575, 435 P.2d 470, 472 (1967); *see also Healey v. Coury*, 162 Ariz.
2  349, 353, 783 P.2d 795, 799 (Ct. App. 1989) (same). If some chance exists that the parties
3  could complete the contract within one year, the statute of frauds does not apply. *Co-Op*
4  *Dairy*, 102 Ariz. at 575, 435 P.2d at 472; *Waugh v. Lennard*, 69 Ariz. 214, 226, 211 P.2d
5  806, 813–14 (1949); *Gold v. Killeen*, 44 Ariz. 29, 37, 33 P.2d 595, 598 (1934).

6        Armored Group's CEO, Robert Pazderka, testified that he expected the oral contract
7  to run indefinitely. (Doc. 154 at 17.) Such a contract is not one of those contracts that is
8  impossible to perform in one year. *See Mullins v. S. Pac. Transp. Co.*, 174 Ariz. 540, 541,
9  851 P.2d 839, 840 (Ct. App. 1992) (distinguishing oral contracts "for an indefinite period,"
10 to which the statute of frauds one-year provision does not apply, from oral contracts with "a
11 definite period" of more than one year, which the statute of frauds bars); *but see Western*
12 *Chance No. 2, Inc. v. KFC Corp.*, 957 F.2d 1538, 1542 (9th Cir. 1992) (analyzing Arizona
13 law and stating in dicta and without citation that a perpetual oral contract cannot possibly be
14 performed within one year, and is therefore unenforceable). Although Pazderka apparently
15 expected the contract to run indefinitely, he also testified that it was a stopgap measure
16 between the end of the previous written contract and the successful execution of a new
17 written contract. Had the parties executed a new written contract within a year, the oral
18 contract would have been performed. Further, one party could have terminated the contract
19 within one year — which is exactly what happened, under Armored Group's version of
20 events. *See Apache Trailer Sales, Inc. v. Redman Indus., Inc.*, 117 Ariz. 504, 506, 573 P.2d
21 904, 906 (Ct. App. 1977) ("the possibility of performance or termination within one year is
22 sufficient to take an oral agreement out of the operation of the statute of frauds"). The Court
23 therefore finds that Armored Group's alleged oral contract is not barred by the statute of
24 frauds' one-year requirement.

25           **B.**      **Counts Two, Three, and Six: Unjust Enrichment, Fraud in the Inducement, and Promissory Estoppel**

26
27       Supreme's attacks on Armored Group's unjust enrichment, fraud, and promissory
28 estoppel causes of action are all founded on essentially the same argument. Specifically,

- 10 -

1 Supreme contends that: (a) nearly all of the actions Armored Group took in pursuing the
2 State Department contract happened before December 31, 2006, and therefore were actions
3 that Armored Group was already obliged to take under the 2004–2006 Contract; and
4 (b) whatever actions Armored Group took in 2007 were irrelevant to procuring the State
5 Department contract and should be disregarded. Therefore, Supreme argues, Armored Group
6 could not rely to its detriment on actions that the written contract required it to take anyway.

7 Supreme's argument essentially claims that Armored Group deserves no
8 compensation for its State Department efforts unless those efforts succeeded during the term
9 of the written contract. Arizona law does not support Supreme's position. "The general rule,"
10 according to the Arizona Supreme Court, "is that if an employee's or agent's compensation
11 is conditioned upon the accomplishment of a certain result, he is entitled to the compensation
12 agreed upon if the services rendered are the effective cause of the result." *J. & B. Motors v.*
13 *Margolis*, 75 Ariz. 392, 398, 257 P.2d 588, 592 (1953). "The effective cause is sometimes
14 spoken of as the procuring cause," which the Arizona Supreme Court has defined as "a cause
15 originating a series of events which, without break in their continuity, result in
16 accomplishment of the prime objective of [the employment or agency relationship]." *Id.*
17 Thus, "[u]nless the contract provides otherwise, if the activities of the agent, while the
18 relationship of agency exists, are the procuring cause, he is entitled to his commission even
19 though the principal himself or others may have intervened and completed the final act of
20 negotiation after the employment ceases." *Id.* This issue comes up most frequently in the
21 context of real estate brokers, but it applies to sale of other property also. *Id.*

22 Here, Armored Group has developed evidence from which a reasonable jury could
23 conclude that Armored Group's efforts were the "procuring cause" of the State Department
24 contract. If a jury so found, then Armored Group may be "entitled to [its] commission even
25 though the principal . . . may have intervened and completed the final act of negotiation . . . ."
26 *J. & B. Motors*, 75 Ariz. at 398, 257 P.2d at 592.

27 Further, Supreme's claim that Armored Group's State Department efforts ceased well
28 over a year before the contract was awarded does not permit this Court to hold, as a matter

- 11 -

of law, that Armored Group's actions were not the "procuring cause." Rather, the effect of the delay is a question for the trier of fact. *See Mohamed v. Robbins*, 23 Ariz. App. 195, 199, 531 P.2d 928, 932 (1975) (affirming trial court's judgment that lapse of one year between end of agency contract and closing of sale was reasonable under the circumstances and therefore did not undermine the procuring cause analysis). Summary judgment is therefore unwarranted on Armored Group's second, third, and sixth causes of action.

### C. Count Four: Tortious Interference with Contract

To prevail on its claim for tortious interference with contract, Armored Group would eventually need to prove that it had a valid contract with the Livonia Police Department. *Miller v. Servicemaster by Rees*, 174 Ariz. 518, 521, 851 P.2d 143, 146 (Ct. App. 1992). Supreme argues that Armored Group cannot sustain this element because Armored Group allegedly lied to Livonia about being the "sole source provider," and therefore no valid contract existed. Supreme's argument does not merit summary judgment for two reasons.

First, Supreme and Armored Group have competing interpretations of "sole source provider." Yet the Court has located nothing in the record that would permit the Court to determine as a matter of law that "sole source provider" could only mean what Supreme alleges it to mean (*e.g.*, as a standard term in the industry), or that Supreme's interpretation is, in fact, what Armored Group and Livonia mutually understood that term to mean.

Second, even assuming that Armored Group lied about being the "sole source provider," then Armored Group's contract with Livonia would only be voidable, not void. *Horne v. Timbanard*, 6 Ariz. App. 518, 520 & n.1, 434 P.2d 520, 522 & n.1 (1967). Arizona courts have apparently not addressed the question of whether one can be liable for interfering with a voidable contract. However, the Restatement section addressing intentional interference with contract — upon which Arizona courts have relied on numerous occasions[1] — is of the opinion that liability may still arise for unjustifiably interfering with a voidable

---

[1] *See, e.g., Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 33, 730 P.2d 204, 211, 212 (1986); *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 387, 710 P.2d 1025, 1042 (1985); *Mattison v. Johnston*, 152 Ariz. 109, 114, 730 P.2d 286, 291 (Ct. App. 1986).

- 12 -

contract. *Restatement (Second) of Torts* § 766 cmt. f. The Court predicts that Arizona would adopt the Restatement's position on this issue. Accordingly, even if Armored Group misrepresented itself to Livonia as the "sole source provider," a valid contract still existed between Armored Group and Livonia, and Supreme was not privileged to interfere with that contract simply because it may have been voidable.

Supreme additionally argues that it cannot be liable for intentional interference because "[s]urely it was not a tortious act for Supreme to tell Livonia the truth." Whether "the truth" is a defense to intentional interference is an unsettled issue among the states. *Compare Hayes v. Advanced Towing Servs., Inc.*, 40 S.W.3d 800, 805 (Ark. Ct. App. 2001) ("although a truthful statement may be less likely to be considered improper, we are not disposed to create a *per se* rule that under all circumstances an actor is justified in interfering [through truthful statements]") *with Liebe v. City Fin. Co.*, 295 N.W.2d 16, 18 (Wis. Ct. App. 1980) (truthful information cannot give rise to a tortious interference claim). No located authority addresses the question under Arizona law, nor does the Restatement have an opinion. Regardless, Supreme's claim that it told Livonia "the truth" begs the question. Armored Group argues that Supreme's representations to Livonia were not true. Because a reasonable jury could conclude as much based on the evidence Armored Group has presented, summary judgment is inappropriate.

### D. Count Five: Breach of Written Contract and Breach of Covenant of Good Faith and Fair Dealing

In its complaint, Armored Group alleged a claim for breach of a written contract, and specifically pleaded the written contract claim in the alternative to its oral contract claim. (Doc. 75 ¶ 85.) Supreme argues that it is entitled to summary judgment on this claim because Armored Group's representative, Pazderka, consistently testified in his deposition that the parties did not operate under a written agreement after the 2004–2006 Contract expired. Further, Pazderka testified that his August 4, 2006 e-mail — the document embodying the written contract, under Armored Group's theory — only "re-summariz[ed]" his telephone conversations with Supreme. Thus, Supreme argues, Armored Group has no evidence that

- 13 -

1  a written contract existed.

2  To this, Armored Group responds that Pazderka's testimony is irrelevant because
3  Pazderka "is not a lawyer" and therefore incapable "of giving a legal conclusion as to what
4  a written contract is." Given that the e-mail proposed a set of terms, and that Supreme
5  allegedly accepted those terms through its conduct, Armored Group asserts that the August
6  4 e-mail can sustain a claim for breach of a written contract — or at least there is "a dispute
7  of fact concerning the parties' intent to have the terms of the August 4 email bind them,"
8  precluding summary judgment.

9  The parties' arguments reduce to a dispute over formalism and realism in contract law.
10 Although the Court does not see, on this record, why Armored Group needs to alternatively
11 frame the August 4 e-mail as both a written contract and evidence of an oral contract, the
12 Court sees no basis to grant summary judgment on this cause of action either. Under some
13 circumstances, the August 4 e-mail could be construed as a written contract, and the evidence
14 presented at this summary judgment phase does not preclude that possibility. The Court may
15 nonetheless revisit the nature of this claim at trial in light of the evidence presented there.

16 IT IS ORDERED that Supreme's Motion for Summary Judgment (Doc. 153) is
17 DENIED.

18 IT IS FURTHER ORDERED that Armored Group's "Motion to Strike
19 (1) Defendants' Controverting Statement of Facts to Plaintiff's Additional Statement of Facts
20 and (2) Portions of Defendants' Reply Brief in Support of their Motion for Summary
21 Judgment" (Doc. 183) is DENIED as moot.

22 DATED this 6th day of October, 2010.

_____
Neil V. Wake
United States District Judge