IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Armored Group, LLC, a Nevada Limited Liability Company,<br><br>    Plaintiff,<br><br>vs.<br><br>Supreme Corporation, a Texas corporation; and Supreme Corporation of Texas, a Texas corporation,<br><br>    Defendants. | No. CV09-414-PHX-NVW<br><br>**ORDER AND OPINION**<br><br>**[Re: Motion at Docket 188]** |

Before the Court is Defendants' Motion to Exclude Plaintiff's Expert Michael A. Fahlman's Lost Profits Damages Testimony. (Doc. 188.) The Court will deny the motion.

Throughout this order, the Court refers to Plaintiff as "Armored Group" and to Defendants collectively as "Supreme." The Court recognizes that some of Defendants' previous arguments have turned on separate treatment for Supreme Corporation and Supreme Corporation of Texas, and Defendants continue to assert that distinction here. The Court's use of "Supreme" is for convenience only and is not intended to state a factual or legal conclusion about the relationship between the two Supreme entities or either entity's relationship to Armored Group.

**I.     Legal Standard**

When one party challenges another's evidence, including expert evidence, Federal Rule of Evidence 104(a) requires this Court to determine, by a preponderance of proof, that

the evidence is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 & n.10 (1993). *Daubert* and *Kumho Tire* establish that district courts must "ensure that any and all [expert] testimony . . . is not only relevant, but reliable." *Daubert*, 509 U. S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). This does not mean that the party proffering expert testimony must "prove their case twice — they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their [experts'] opinions are reliable." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) (emphasis in original).

Federal Rule of Evidence 702, amended in 2000 to reflect the requirements of *Daubert* and *Kumho Tire*, describes the issues a court must consider when evaluating the reliability of challenged expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

But again, "the test . . . is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (remand decision). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . . [that otherwise] meets the standards of Rule 702." *Daubert*, 509 U.S. at 596.

**II.    Background**

    **A.    The State Department Dispute**

Armored Group and Supreme are both in the business of specialized vehicles such as armored cars. From 1996 through the end of 2006, Armored Group was Supreme's exclusive

distributor.  During those years, Supreme and Armored Group operated under a series of written contracts through which Supreme agreed to pay Armored Group a 10% commission on armored vehicles and related products sold by Armored Group on behalf of Supreme.

The parties' final formal contract expired at the end of 2006, but they allegedly continued to do "business as usual" under an oral agreement and/or a less formal written contract through July 2007.  At that point, Supreme formally terminated its relationship with Armored Group.  The following month, the U.S. State Department awarded an armored vehicle contract to Supreme which could last for as long as five years (five one-year options) and pay as much as $98 million, although the contract guaranteed no minimum number of sales.

Armored Group claims that it had been working since 2003 to bring Supreme and the State Department together.  Armored Group believes that Supreme ended its relationship with Armored Group because Supreme knew that the State Department contract was forthcoming and Supreme wanted to avoid paying commissions on those sales.

**B.    Armored Group's Damages Expert**

Armored Group hired an expert, Michael Falman, to calculate its damages.  (*See* Doc. 201 at 3 (Fahlman's expert report) (filed under seal).)  Fahlman conducted what amounted to a lost profits analysis.  However, because Armored Group's lost profits (*i.e.*, its commissions) are a function of Supreme's sales, Fahlman's analysis focused almost entirely on Supreme's past and predicted future performance under the State Department contract, estimating total contract earnings of about $111 million.[1]  At the time Fahlman submitted his report (May 2010), Supreme had apparently already earned almost $31 million under the

---

[1] The record does not disclose why Armored Group can recover commissions on estimated future sales, as opposed to actual future sales as they happen. *Cf. County of La Paz v. Yakima Compost Co., Inc.*, 224 Ariz. 590, 610, ¶ 62, 233 P.3d 1169, 1189 (Ct. App. 2010) ("The nonbreaching party may . . . receive damages for the breaching party's failure to perform one part of the contract and also attain specific performance of the contract as a whole."). Awarding future lost profits before the contract expires could give Armored Group more than the benefit of its bargain.  But Supreme has not objected on these grounds.

contract, and Fahlman estimated that Supreme would earn another $54 million before the contract's five-year term expired, for a total of $85 million. Fahlman also calculated a hypothetical sixth year in which he estimated that Supreme would earn another $26 million, for a total of $111 million. Fahlman justified this sixth year through snippets of testimony in certain depositions, as well as through an analysis of numerous State Department contracts supposedly showing that the State Department, with reasonable frequency, extends its procurement contracts for at least one year.

Fahlman calculated most of his dollar figures assuming that Supreme's sales to the State Department would grow 22.7% annually. Fahlman says that he chose 22.7% to err on the conservative side. His calculations showed that the actual growth rate from the first to the second year of Supreme's contract had been 124%, the actual growth rate from the second to the third year was 42%, and that the State Department's overall spending on armored vehicles grew at about 27% since the Supreme contract began. Fahlman derived his 22.7% growth rate by examining the State Department's armored vehicle spending from 2002 through 2007 (the five years preceding the Supreme contract). Fahlman, however, did not apply this growth rate to his hypothetical sixth contract year. Rather, he assumed that sales would remain flat between years five and six.

Fahlman's calculations accounted for the likelihood of contract termination. Government procurement contracts (including Supreme's State Department contract) contain a "termination for convenience" clause, allowing the Government to end the relationship for almost any reason. Fahlman's research revealed that the Government exercises this option only about 0.26% of the time. Fahlman therefore reduced its earnings calculations by 0.26%. Fahlman also applied a discount rate of 12.7% based on his analysis of Supreme's financial stability.

### III. Analysis

#### A. The Bottom Line Calculation

Supreme argues that Fahlman's methodology cannot possibly be reliable because it

1 arrives at a bottom line estimate that Supreme will earn $111 million under the State
2 Department contract — $13 million more than the contract's $98 million maximum value.
3 But Supreme ignores how Fahlman arrived at this number. Fahlman first accounted for
4 Supreme's actual earnings to date, and then added his estimate of how much more Supreme
5 would earn through the contract's fifth year. That amounted to approximately $85 million
6 — $13 million less than the contract's maximum value. Fahlman then included a separate
7 $26 million line item for his hypothetical sixth year, bringing total earnings to $111 million.
8 There is nothing unsound about this methodology.

9 Supreme argues, however, that the very possibility of a sixth year is spurious. But this
10 is not an issue of admissibility or reliability. Fahlman did not make an expert conclusion
11 about whether a sixth year would happen. He instead gathered evidence which, in his mind,
12 reasonably supported the possibility of a sixth year, and then estimated the value of that year.
13 Whether a sixth year is likely or even possible remains an issue of fact for the jury, if
14 Armored Group chooses to pursue it at trial. Given that Fahlman offered his year six
15 estimate as a separate line item — easily disregarded if a jury concludes that there would be
16 no year six — the Court sees nothing inadmissible or unreliable in Fahlman's calculations.
17 *Cf. County of La Paz*, 224 Ariz. at 608, ¶ 54, 233 P.3d at 1187 ("[The expert] did not opine
18 on whether Los Angeles would renew the contract but merely calculated damages under the
19 assumption it would do so; if the jury rejected this notion, it could adjust the number.").

20 **B.     Estimated Growth Rate & State Department Expectations**

21 Supreme next argues that Fahlman's 22.7% growth rate is based on insufficient facts
22 or data because Fahlman did not consider deposition testimony from State Department
23 employees about the State Department's expectations for the Supreme contract. Supreme
24 specifically points to the testimony of Ricky Motley, a State Department employee familiar
25 with the Supreme contract. Motley testified that the State Department picked the $98 million
26 contract ceiling by roughly doubling what it thought it would spend. Motley further testified
27 that he did not expect the State Department to spend more than 40–50% of the total contract
28

value, and that he believed Supreme was on pace for no more than that. Without considering this testimony, Supreme argues, Fahlman's opinions are not reliable.

Fahlman admitted in his deposition that he did not read any State Department depositions, and his report contains nothing about Motley's expectations. Accounting for such expectations — at least as an alternative scenario — may have been helpful, but that does not mean that Fahlman's opinions are unreliable. They are simply subject to impeachment. Accordingly, the Court will not exclude Fahlman's testimony on these grounds.

### C. Avoided Costs

The parties agree that the basic formula for calculating lost profit damages is gross profits minus the costs the plaintiff would have incurred to generate those profits. The latter variable is sometimes referred to as "avoided costs" because the plaintiff avoided having to spend that money due to the defendant's profit-stealing conduct. Here, Supreme argues that Fahlman's calculations are unreliable because he accounted for little or no avoided costs. Supreme emphasizes that Fahlman, at his deposition, admitted he had not reviewed Armored Group's balance sheets, income statements, sales figures, profit margins, customer lists, and so forth. Supreme believes that Fahlman's conclusions cannot be reliable if he did not account for such information and use it to calculate avoided costs.

In a typical lost profits case, Supreme would have a colorable argument. But this is not a typical case. A lost profits analysis usually examines the sales the plaintiff would have made but for the defendant's wrongful conduct. Here, however, Armored Group argues that it already made the sale — it just hasn't been paid for it. Armored Group therefore avoided no costs, but rather incurred costs allegedly to bring Supreme and the State Department together, and now Armored Group seeks compensation for its efforts. The size of Armored Group's compensation — supposedly a 10% commission — does not turn on Armored Group's financial status. Accordingly, the Court will not exclude Fahlman's opinions on this basis.

Nor will the Court exclude Fahlman's opinions for failure to consider potential commissions that Armored Group may be required to pay to its own sales associates. Supreme alludes to such commissions (Doc. 188 at 12 n.3) but does not elaborate. Commissions that Armored Group must pay to its own personnel are not avoided costs unless those to whom commissions are owed have waived that right or agreed to accept less. The Court has seen no evidence of such agreements, nor would they provide a reason to exclude Fahlman's testimony.

### D. "Reasonable Certainty" Under Arizona Law

Supreme claims that Fahlman's report does not create the reasonable certainty that Arizona requires when seeking future lost profits damages. *See*, *e.g.*, *Gilmore v. Cohen*, 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963) ("The burden [is] on the plaintiffs to show the amount of their damages with reasonable certainty. . . . The requirement of 'reasonable certainty' in establishing the amount of damages applies with added force where a loss of future profits is alleged."). This is not a Rule 702 argument, and it is otherwise premature.

The reasonable certainty standard encompasses all of the evidence presented at trial. *See*, *e.g.*, *Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, 165, 158 P.3d 877, 888 (Ct. App. 2007) (affirming a jury's damages award based on a broad range of evidence). Nothing in the record indicates that Fahlman will be the only trial witness to address damages. Therefore, this Court cannot determine whether the evidence as a whole provides the reasonable certainty required for a jury to award future lost profits damages.

### IV. Order

For the reasons set out above, it is therefore **ORDERED** that Defendants' Motion to Exclude Plaintiff's Expert Michael A. Fahlman's Lost Profits Damages Testimony (Doc. 188) is **DENIED**.

DATED this 15th day of November 2010.

/S/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE